El Pueblo de Puerto Rico, demandante y apelado, *v.*
Tomás Díaz, acusado y apelante.

Núm. 9857.—*Sometido:* Abril 7, 1943.   *Resuelto:* Mayo 17, 1943.

*Hernán R. Franco,* abogado del apelante;  *R. A. Gómez, Fiscal del
Tribunal Supremo,* abogado de El Pueblo, apelado.

El Juez Asociado Señor Todd, Jr., emitió la opinión del tribunal.

El apelante, Tomás Díaz, fué acusado de un delito de incesto, cometido en uno de los días del mes de junio de 1939, por haber tenido contacto carnal con Margarita Díaz, hija legítima del acusado.   El jurado lo declaró culpable y contra la sentencia de ocho años de presidio que le impuso la Corte de Distrito de San Juan estableció el presente recurso de apelación en el que hace diecisiete señalamientos de error. Dada la conclusión a que hemos llegado de que la sentencia debe ser revocada y devuelto el caso para la celebración de un nuevo juicio por haberse admitido prueba inadmisible y perjudicial al acusado, nos limitaremos a considerar los señalamientos de error siguientes:

"5. Declarar sin lugar la solicitud de 'Mistrial' del acusado apelante.

"8. No excluir a Juana Díaz como testigo del fiscal y permitir su declaración.

"9. Permitir al Fiscal presentar prueba de supuestos actos similares cometidos por el acusado apelante con terceras personas."

Antes de proceder a discutir estos errores, que sólo envuelven una cuestión, debemos decir que después de haber

declarado la presunta perjudicada Margarita Díaz en cuanto a la forma en que su padre, el acusado, había tenido relaciones carnales con ella, el fiscal llamó a declarar a la testigo Juana Díaz, otra hija del acusado. Declaró que era casada con Mariano Castro y entonces el fiscal le preguntó: "¿Cuándo usted se casó con Mariano Castro le había pasado algo?" Se opuso la defensa a la pregunta alegando que en estos casos no era admisible prueba tendente a probar actos ilícitos del acusado con terceras personas. La corte sostuvo la objeción de la defensa y no permitió la pregunta. Esto no obstante, en el examen redirectó del fiscal a esta misma testigo ocurrió lo siguiente:

"P. Dígame, Juanita, usted tenía interés en mudarse de su casa?
"R. Sí, señor.
"P. ¿Por qué?
"R. Porque a mí no me gustaba vivir al lado de mi padre.
"P. ¿Por qué?
"Defensa. Me opongo si es por aquello.
"R. Porque él no me respetaba desde niña.
"Defensa. Yo voy a solicitar un mistrial; que se retire el Jurado, señor Juez."

Argumentada la cuestión en ausencia del jurado la corte declaró sin lugar la moción de la defensa por entender que ninguna de las preguntas del fiscal "han sido en violación del *ruling* de la corte prohibiendo declarar sobre actos incestuosos de la testigo con su padre. Y la corte le advierte al fiscal que no continúe por esa línea de repreguntas."

Continuó el juicio y el acusado, además de presentar otra prueba, declaró en su propia defensa y negó haber tenido contacto carnal con su hija Margarita. En el contrainterrogatorio del fiscal declaró que nunca había maltratado a sus hijas aunque les había pegado cuando las reprendía o castigaba; volvió a negar haber cometido acto carnal alguno con su hija Margarita y dijo que había tratado a todas sus hijas iguales y más adelante declaró:

"P. Usted usó una frase, usted dijo—Mi carácter no da para eso—cuando el compañero Franco le pregunto si era verdad que había dormido con su hija esa noche, ¿qué quiso decir usted?

"R. Que yo soy un hombre de conciencia y en ningún momento yo voy a hacer una cosa tan grande como esa con una hija de mi corazón.

"P. Y *su conducta y su carácter de acuerdo con esa situación, ¿cómo es?*

"R. Yo soy un hombre que tengo alguna conciencia y sé que es mi hija y en ningún momento mi corazón me da para yo hacer una cosa tan semejante con una hija mía, que es una hija de mi corazón.

"P. ¿Eso quiere decir que usted era bueno con sus hijas?

"R. Supóngase usted si yo sería bueno con mis hijas que mis hijos hasta la fecha fueron buenos todos porque mis hijos..."

" "  .      .       .        .        .        .         .

"P. ¿Qué es lo que usted quiere decir con que ha tratado a todos los hijos iguales?

"R. Porque todos son mis hijos.

"P. ¿Qué es lo que usted quiere decir?

"R. Que son mis hijos y los trato a todos iguales.

"P. ¿Entonces al igual que trató a Margarita ha tratado a todos sus hijos?

"R. Sí, señor, hasta la fecha, pero no en las condiciones que ella me acusa."   (Bastardillas nuestras.)

Terminada la prueba de la defensa y retirado el jurado ocurrió lo siguiente:

"Fiscal: Señor Juez: Anuncio a V. H. que mi prueba de *rebuttal* va a consistir en lo siguiente: la declaración de Juana Díaz para declarar sobre actos cometidos por Tomás Díaz con ella ya que el acusado en su declaración en el interrogatorio directo hecho por la defensa, así como también en el contrainterrogatorio del fiscal ha hecho constar enfáticamente *que su conducta es intachable* y que su conciencia no le da para realizar los actos que se le imputan y negar haber cometido incesto con su hija Margarita."

" "  .      .        .        .        .        .         .

"Juez: ...En cuanto a la otra declaración que se trata de presentar para demostrar que el acusado ha tenido actos carnales con otras de sus hijas es un principio reconocido por toda la jurisprudencia que en casos de esta naturaleza no se puede presentar prueba directa de actos cometidos por el acusado con una tercera persona,

pero esa misma jurisprudencia sostiene que esa prueba es admisible y puede presentarse para refutar las manifestaciones del acusado. Como el acusado ha declarado aquí que ha sido un modelo de padre, la corte permite la prueba que ofrece el fiscal y la corte cita 13 Cal. Jur. 969, y 14 Ruling Case Law 38. Que se entienda excepcionada la resolución ·de la corte y la prueba que se presente objetada y excepcionada también.''

En efecto el fiscal presentó como prueba de *rebuttal* el testimonio de Juana Díaz, otra hija del acusado, quien declaró, con oposición de la defensa, que hacía doce o trece años que se había casado con Mariano Castro y que antes de casarse su padre la había deshonrado y que no se lo había dicho a nadie más que a su esposo después de haber tenido ella su tercer hijo. El acusado como prueba de *sub-rebuttal,* volvió a declarar y negó haber deshonrado a su hija Juana.

En sus instrucciones al jurado la corte inferior, en cuanto a este aspecto del caso, se limitó a resumir la declaración de Juana Díaz y dijo que había sido presentada ''para refutar las manifestaciones del acusado en cuanto a su conducta con sus hijas.'' También hizo referencia a la declaración del acusado negando la imputación de su hija Juana.

La cuestión a resolver es si la corte inferior cometió error al admitir, en *rebuttal,* y con el fin de contradecir la alegada buena conducta del acusado para con sus hijas, prueba de un acto específico de incesto cometido por aquél con otra hija que no es con la que se alega en la acusación se cometió el delito· de incesto imputado. La corte citó bien la regla general de que esa prueba es inadmisible como prueba directa de la acusación. Así lo sostienen los tratadistas y autoridades. 1 Wharton's *Criminal Evidence* (11th ed.) 537, §356; Underhill, *Criminal Evidence* (4th ed.) 56, §186, y los casos citados en las notas. Empero, la corte inferior admitió la prueba en *rebuttal* bajo la teoría de que con ella se impugnaba la ''conducta modelo'' que había declarado el acusado observó con sus hijas, y citó a 13 Cal. Jur. 970, §4 y 14 R.C.L. 38, §8. Veamos si estas autoridades sostienen dicha regla.

En 13 Cal. Jur. 970, sección 4, que trata sobre la evidencia en casos de incesto, se dice lo siguiente:

"La regla está bien establecida en California de que prueba en cuanto a actos de contacto carnal anteriores y subsiguientes entre las partes son admisibles para demostrar que el acusado tenía inclinación hacia el adulterio, incesto o a la lascivia, y no para probar delitos distintos o continuidad criminal, sino como prueba corroborativa tendente a sostener el delito específico imputado. De otro lado, testimonio tendente a demostrar la disposición por medio de prueba de que cometió el mismo delito con otra persona distinta a la mencionada en la acusación no es admisible, excepto quizás por vía de contradecir la declaración del acusado. El testimonio de una tercera persona al efecto de que el acusado cometió el mismo delito con ella no puede ser admitido para corroborar el testimonio de la perjudicada, que es una cómplice."

En 14 R.C.L. 38, sección 8 se dice, en lo pertinente:

". . . De acuerdo con el peso de las autoridades prueba de otros actos carnales entre las mismas partes es admisible, cómo tendiente a demostrar disposición a realizar el acto imputado, aunque algunos casos sostienen que esa prueba no es competente. Pero . . . prueba de conducta lasciva o contacto sexual entre una de las partes y terceras personas no es admisible, excepto con el fin de contradecir una inferencia a que pueda llegarse de cierta prueba ya admitida."

En las notas se citan solamente tres casos, *People* v. *Turco,* 29 Cal. App. 608, 156 Pac. 1001; *People* v. *Letoile,* 31 Cal. App. 166, 159 Pac. 1057, y *Skidmore* v. *State,* 57 Tex. Crim. 497, 123 S. W. 1129. Estos casos no constituyen autoridad para sostener la teoría bajo la cual fué admitida la declaración de Juana Díaz.

En el caso de *People* v. *Turco,* supra, lo que se resolvió fué que:

"En un proceso por el delito de incendio malicioso donde se llamó de nuevo a un testigo y declaró en cuanto a manifestaciones que le hizo el acusado, que habían sido negadas por el acusado, y que se referían a conversaciones sobre las cuales ya había declarado originalmente el testigo, aunque las preguntas hechas fueron sugestivas por referirse a ciertas manifestaciones específicas en lugar de requerir

que el testigo explicara la conversación en sus propias palabras, dichas preguntas eran admisibles en rebuttal con el fin de impugnar (la veracidad del acusado)." (Paréntesis nuestro.)

La propia Corte Suprema de California en el caso de *People* v. *Letoile,* supra, resolvió expresamente que la regla expuesta en el caso de *People* v. *Turco,* supra, no era aplicable a un caso de incesto en que se presentó, al igual que en el caso de autos, como prueba de *rebuttal,* la declaración de otra hija del acusado al efecto de que éste había realizado actos carnales con ella. Dijo la corte:

"Se sugiere, sin embargo, que el testimonio fué debidamente admitido en rebuttal porque el acusado había abierto la puerta al declarar que había tenido disgustos con sus hijas Lucy y Mary porque se quedaban fuera de la casa tarde en la noche en contra de sus deseos, y que ése fué el único disgusto que tuvo con ellas. . . . Fué solamente en la repregunta y bajo decisiones adversas al objetar las preguntas que el acusado declaró que él no había tenido ningún otro disgusto con sus hijas. En cuanto a la hija Mary esto era inmaterial al caso. Ella no había declarado y por lo tanto no había dado testimonio a favor ni en contra del acusado.

"En *People* v. *Turco,* 156 Pac. 1001, tuvimos ocasión de examinar las autoridades que se refieren a la limitación del derecho de repreguntas a un acusado en un caso criminal y la limitación del derecho a ofrecer testimonio en rebuttal basado en los hechos expuestos por tal contrainterrogatorio. Se reconoció el principio de que el pueblo tiene el derecho en el contrainterrogatorio del acusado a obtener cualquier cosa que tienda a contradecir o modificar su testimonio dado en el examen directo, y que tal testimonio del acusado pueda ser contradicho por prueba en rebuttal. En el caso presente, sin embargo, no creemos que las circunstancias demostradas por el récord sean de tal naturaleza que justifiquen la aplicación de la regla mencionada. El testimonio de la testigo Mary Letoile a que nos hemos referido debió haber sido excluído."

En el último caso citado, o sea el de *Skidmore* v. *State,* 123 S. W. 1129, no estaba envuelta la admisibilidad de prueba de *rebuttal,* de otros actos carnales realizados por el acusado. Lo que se admitió fué prueba del acusado de que la perjudicada había tenido contacto carnal con otro hombre y aun así

se sostuvo que no era admisible prueba de *rebuttal* consistente en la declaración de un testigo tendente a demostrar que él no había visto a la perjudicada conducirse impropiamente.

El artículo 244 de nuestro Código de Enjuiciamiento Criminal dispone que:

"Podrá impugnarse la veracidad de un testigo por la parte en cuya contra haya sido llamado a declarar, bien mediante prueba contradictoria, bien demostrando que su reputación como persona veraz, honrada e íntegra, es mala; pero no por medio de prueba respecto de hechos especiales y penables cometidos por él, a menos que resulte del examen del testigo, o del registro de la sentencia, que dicho testigo fué convicto de un delito grave (*felony*)."

Y el artículo 520 del Código de Enjuiciamiento Civil (Artículo 158 L. de E.), dispone lo siguiente:

"Un testigo. podrá ser tachado por la parte contra quien fuere llamado, mediante evidencia contradictoria, o de que su reputación en cuanto a veracidad, honradez o integridad es generalmente mala; pero no con evidencia de determinados actos reprobables, salvo que podrá probarse mediante el examen del testigo, o la anotación de la sentencia, que fué convicto de delito grave (*felony*)."

Esta corte ha resuelto que para impugnar la veracidad, reputación o conducta de un testigo no puede presentarse prueba tendente a demostrar actos específicos de su inmoralidad, *Camacho* v. *Balasquide,* 19 D.P.R. 590, o atacar su veracidad con prueba de determinados actos reprobables, *Pueblo* v. *Alméstico,* 18 D.P.R. 320, y aun que en el examen de repreguntas no puede ser examinado, so pretexto de que se va a impugnar su veracidad o a prepararse para ello, sobre cuestiones que no afectan su crédito y que la parte que repregunta no tiene derecho a ponerlas de manifiesto para otros fines, *Pueblo* v. *Ramírez de Arellano,* 25 D.P.R. 263; *Pueblo* v. *Pou,* 55 D.P.R. 304.

En el tratado de Wigmore *on Evidence,* vol. 1, pág. 642, sección 193, se expone la doctrina en la siguiente forma:

"Sección 193.—*Actos específicos malos para demostrar carácter del acusado; (1) Relevancia.* Ya hemos visto (antes sección 58) que si un acusado en un caso criminal ofrece su buen carácter (para el fin apropiado) como un argumento de que él probablemente no cometió la ofensa imputada, el fiscal puede por contraevidencia disputar la existencia de tal buen carácter alegado; y también hemos visto que el hecho a ser probado o no probado es la verdadera disposición o carácter, del cual la reputación o cualquiera otra cosa es meramente la evidencia.

"La cuestión que surge es en qué forma se va a probar o a no probar dicho carácter. Como hemos notado hay tres formas de evidenciarlo: (1) reputación en la comunidad; . . . (2) conocimiento personal u opinión de aquéllos que conocen al acusado; . . . (3) actos específicos de mala conducta que demuestran el rasgo particular envuelto. Esta última clase de evidencia es la que pasamos a considerar.

"La ley aquí declara una regla general y absoluta de exclusión. Está prohibido, al demostrarse que el acusado no tiene el buen carácter que él afirma, el recurrir a actos específicos de mala conducta suya.

"¿Está esta prohibición basada en la irrelevancia de tal evidencia o en alguna razón de política auxiliar (*auxiliary policy*) que asume su relevancia pero ve razones de política para su exclusión? Que tal mala conducta anterior es relevante, es decir, tiene valor probatorio para persuadirnos del carácter general o disposición, no puede ser dudado."

Después de hacer extensas citas de autoridades, continúa el autor en la sección 194, página 646, exponiendo las razones de la regla en esta forma:

"Puede quizás decirse que es precisamente por la indubitable relevancia de tal evidencia que es excluída. Es censurable, no porque no tenga un valor probatorio apreciable, sino porque tiene demasiado. La natural e inevitable tendencia del tribunal—ya sea el juez o el jurado—es dar excesivo peso al vicioso récord criminal así exhibido, y bien permitirle que haga demasiada presión sobre la acusación pendiente, o el tomar la prueba como justificativa de una condena irrespectivamente de la culpabilidad en la acusación pendiente. Además, el uso de alegados actos específicos que pueden referirse a toda la vida del acusado hace imposible que éste pueda estar preparado para refutar el cargo, cualquiera o todos de los

cuales pueden ser mera fábula. Estas razones de política auxiliar dirigidas a evitar los riesgos de obtener veredictos sin suficiente evidencia, han operado para excluir aquello que en sí mismo es relevante.''

Continúa exponiendo Wigmore que originalmente en Inglaterra se admitía esta clase de evidencia pero que desde hace tres siglos, o sea desde que comenzó la reacción liberal con la restauración de los *Stuarts,* esta política de exclusión, por uno u otro de sus razonamientos, ha recibido la sanción judicial cada vez más enfática según pasa el tiempo y la experiencia, y que representa una verdadera revolución en la teoría de juicios criminales y presenta uno de los rasgos peculiares de importancia que diferencia el sistema de evidencia angloamericano del continente europeo. Después de citar jurisprudencia inglesa y americana en relación con la materia, continúa diciendo el autor:

''Las razones así expuestas en varias formas pueden reducirse a tres: (1) la muy fuerte tendencia de creer al acusado culpable del hecho imputado meramente porque es una persona capaz de realizar tales actos; (2) la tendencia de condenar, no porque se le crea culpable de la acusación presente, sino porque se ha escapado sin haber sido castigado por otros delitos; ambas de éstas representan el principio de prejuicio indebido (*post* sección 1904); (3) la injusticia de atacar a un acusado necesariamente impreparado para demostrar que la evidencia presentada es fabricada; esto representa el principio de la sorpresa injusta (*post* sección 1849) . . .

''Además, debe notarse, la exposición judicial de estas razones demuestra la falacia de suponer, como algunos lo hacen, que el objeto de la regla es meramente mostrar compasión al culpable, darle una última oportunidad a su vida o libertad poniendo un obstáculo artificial al fiscal, inyectando en esta forma en las cortes de justicia las nociones del 'sportmanship'. Por el contrario, el objeto es evitar que una persona que no es culpable de la acusación que se le hace, sea impropiamente declarada culpable de ella. Si a pesar de esto se dice que constituye un espíritu de bondad hacia el culpable tratando de evitar que sea castigado ahora por lo que había hecho anteriormente, la contestación es que eso no obstante estamos protegiendo a una persona que es teóricamente inocente de la acusación de que

sea declarado ahora culpable de un delito que cometió en el pasad que él ignoraba sería presentado en su contra y el cual no tiene opor tunidad de demostrar que es falso.''

Véase además ''Model Code of Evidence'' del American Law Institute, aprobado en mayo 15 de 1942, reglas 306 311, y Stone, *The Rule of Exclusion of Similar Fact Evi dence,* 46 Harv. L. Rev. 954.

Aun cuando sea extender innecesariamente esta opinión pasamos a citar algunos casos de naturaleza similar al d autos en los que se ha aplicado la regla anteriormente ex puesta.

En *People* v. *Luce* (Mich., 1920), 178 N. W. 54, se imputó al acusado el haber realizado actos obscenos con una niña. Al declarar el acusado negó el hecho imputado y además dijo que nunca lo había realizado con ninguna otra persona. En el contrainterrogatorio el fiscal le preguntó si no lo había realizado con otra niña en cierta fecha y el acusado lo negó. En *rebuttal* el fiscal puso a declarar a la otra niña y se le permitió que declarara que el acusado había realizado actos obscenos con ella. La corte resolvió que si bien la repregunta era admisible por la forma en que había declarado el acu sado, eso no justificaba el que se hubiera permitido declarar a la otra niña. La corte dijo:

''En esta clase de casos el único testimonio usualmente producido es el de la perjudicada y el del acusado. Hechos tendentes a demostrar la comisión de una ofensa similar con otra niña en otra ocasión, aunque restringida por la corte al hecho de la credibilidad, no pueden menos que prejuiciar al jurado e inconscientemente llevarlo a la conclusión de que el acusado tiene el hábito de realizar dichos actos con niñas pequeñas. La probabilidad es fuerte de que en esta forma perdería el beneficio de la duda razonable a que tiene derecho.''

En *State* v. *Ruttberg* (N. J., 1915), 93 Atl. 97, se trataba de un caso de fornicación en el que se alegó como error el haberse permitido al Estado repreguntar al acusado en cuanto a sus relaciones ilícitas con otra mujer, y habiéndolo negado, el permitir que dicha mujer fuera llamada como tes-

igo para contradecirlo. La corte resolvió que era error permitir la repregunta pero como el acusado negó las relaciones el error no fué perjudicial; pero que el permitir que la otra mujer declarara para contradecir al acusado fué un error manifiestamente perjudicial y que era igualmente claro que dicho testimonio era incompetente.

En el caso de *State* v. *Herson* (N. H., 1930) 152 Atl. 276, se trataba de un caso de violación. El acusado también declaró y en la repregunta negó haber cometido otro delito similar con otra niña a la que se trajo en *rebuttal* a declarar para contradecirlo. La corte resolvió que esta prueba era inadmisible y que fué manifiestamente perjudicial pues el hecho de que el acusado hubiera negado la conducta anterior imputada no daba base para que el Estado trajera dicha prueba para desacreditarle o para ningún otro propósito. Resolvió además la corte que la declaración del acusado no había puesto en controversia su buen carácter, y dijo: "Además, tal *issue*, de haberse presentado, no podía impugnarse con prueba de un acto específico".

En el caso de *People* v. *Nelson* (Mich., 1924), 198 N. W. 935, se acusó de un delito de incesto cometido con una hija y la corte permitió prueba, sin objeción del acusado, de que él había realizado el mismo delito con una hijastra. En sus instrucciones al jurado la corte hizo constar que admitió dicha prueba con el fin de demostrar el carácter del acusado y que si era creída por el jurado podrían determinar en cuanto a la probabilidad de que hubiera cometido el otro delito con su propia hija. La corte resolvió que la admisión de dicha prueba y la instrucción al jurado en relación con la misma eran tan claramente erróneas que procedía la revocación de la sentencia.

En el caso de *State* v. *Williams,* 103 Pac. 250, la Corte Suprema de Utah resolvió, según aparece del sumario, que: "En un proceso por violación, constituía error revocable el permitir al Estado en el contrainterrogatorio del acusado

obligarle, con su objeción, a contestar preguntas que insinua
ban la idea de que él había permitido que otras niñas fuera
a su casa con el fin de que él pudiera violarlas.''

En *Wentz* v. *State* (Md., 1930), 150 Atl. 278, se trataba
de un caso de Incesto cometido con una hija, y se resolvió
que el haber admitido prueba de que el acusado había reali
zado actos criminales con otra hija constituye error revoca
ble. Aunque en este caso la declaración de la otra hija fu
admitida como prueba directa del pueblo, el fiscal sostuv
que era admisible para demostrar la disposición, pasión
emociones del acusado, pero la corte resolvió que ni aun par
ese fin era admisible dicha prueba, y dijo:

"El testimonio de la otra hija, no como prueba de un delito inde
pendiente, sino como prueba de la clase de hombre que era el padre
y de que era capaz de cometer tal delito, pudo tener suficiente pes
para inclinar la balanza en su contra. Que pudo tener tal efecto
en vista de la opinión de esta corte de que no era admisible, lo hac
un error revocable."

Aplicando las autoridades citadas a los hechos del cas
de autos, somos de opinión que la declaración de Juana Día
era inadmisible como prueba de la conducta o carácter de
acusado. Dicha prueba perjudicó al acusado por el efect
que indudablemente pudo tener en la mente del jurado, a
considerar que si el acusado había ultrajado a otra hija de
bía dar más crédito a la prueba del Pueblo que tendía a de
mostrar la comisión del delito imputado en la acusación. E
obvio que dicha prueba pudo tener el efecto de destruir cual
quier duda razonable en la mente del jurado. Es lamentabl
que los esfuerzos repetidos del fiscal por inyectar indebida
mente esta prueba inadmisible desde que inició su evidenci
directa, tuvieran por fin éxito, pues la misma no era necesa
ria para que el jurado pudiera determinar la culpabilidad
inocencia del acusado en cuanto al hecho específicamente im
putado.

*Por las razones expuestas, nos vemos obligados a resolver que el noveno error fué cometido y que el mismo conlleva la revocación de la sentencia y la devolución del caso para la celebración de un nuevo juicio.*